IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 10-01783-TUC-FRZ (JCG) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| Michael William McKerlie, | ) | |
| Defendant. | ) | |

Pending before the Court is Defendant Michael McKerlie's Motion to Suppress or Exclude Statement. (Doc. 16.) The government filed a response to the motion. (Doc. 18.) Evidence was taken at a hearing on September 8, 2011; Defendant was present and represented by counsel. At the conclusion of the hearing, the matter was taken under advisement. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny the Motion.

**Background and Factual Findings**

Defendant moves to suppress statements he made to agents from the Federal Bureau of Investigations (FBI), at his home, after the agents executed a search warrant at the home. The investigation began when an FBI agent downloaded images of child pornography and traced the images to an IP address tied to the Defendant's residence. FBI agents obtained a search warrant to search the residence for evidence of child pornography. The search warrant was executed by a team of FBI agents on August 7, 2009. When agents arrived at

the house that morning, no one was home. Agents found the front door unlocked, went inside, and conducted the search.

Once the search began, FBI Special Agent Eric Campbell, the lead agent in the investigation, attempted to call the Defendant. Agent Campbell thought that he was calling the Defendant's cell phone. In fact, the number he had was for Defendant's place of employment. The FBI had determined before the search that Defendant worked as a correctional sergeant for the Department of Corrections, at the facility located on Wilmot Road, in Tucson, Arizona. When Agent Campbell called the facility, he left a message for Defendant indicating that he was from the FBI and was trying to reach Michael McKerlie. Agent Campbell did not explain why he was trying to reach Defendant.

Defendant must have received the message because sometime that morning, he called Agent Campbell. Agent Campbell identified himself as an FBI agent and explained that he was at Defendant's residence in conjunction with the execution of a search warrant with respect to child pornography. Agent Campbell told Defendant he wanted to talk to him if possible at the house or at the FBI office. He did not tell him that he had to come to the house. It was an either/or choice. Agent Campbell told him he would stay at the house if Defendant was coming that morning.

According to Agent Campbell, Defendant was cooperative during the phone conversation. Defendant agreed to meet with him at the residence and, when Agent Campbell told Defendant they were having trouble accessing a large safe in the bedroom, the Defendant volunteered the combination. According to Agent Campbell, the Defendant did not seem at all hesitant.

Agents had also attempted to contact Mrs. McKerlie, but had not heard from her. Agent Campbell testified that he also wanted to talk to Mrs. McKerlie because the agents could not determine from the IP address who had used the computer to download the images.

A short time after the phone call, Defendant arrived at the house with his wife, who also worked at the corrections facility. They parked their car in the carport and entered the side entrance to the residence which brought them into the kitchen area. By this time, all FBI

1 agents had left the house except for Special Agents Campbell and Steven Gumtow. Both
2 agents were dressed casually in polo shirts and cargo pants, and were sitting in the kitchen.
3 Both were armed, although their weapons were concealed beneath their shirts, which were
4 untucked. Their unmarked car was parked outside.

5 Agents Campbell and Gumtow greeted the McKerlies as they came into the kitchen,
6 showed them their FBI credentials, explained why they were there, provided the McKerlies
7 with a copy of the search warrant, and indicated they would like to speak with each of them.
8 The McKerlies were cooperative. When Agent Campbell stated that they would like to speak
9 to each privately, Mrs. McKerlie left the room and went into a back bedroom.

10 The Defendant and the agents walked to the living room. The Defendant sat on one
11 of the couches and Agent Campbell sat on a couch perpendicular to the first couch. Agent
12 Gumtow sat beside Agent Campbell either on the couch or on a separate chair. The seating
13 arrangement permitted the Defendant access to all other areas of the house. There were
14 several doors leading from the living room to other areas including a sliding glass door that
15 led to the backyard and the main door to the front of the house. No doors were blocked. The
16 agents testified that the Defendant was free to leave the room.

17 According to Agent Gumtow, Defendant was friendly and polite and seemed eager
18 to speak to the agents. The interview started with general chit chat. Defendant was told that
19 he was not under arrest. When Agent Campbell told Defendant why the FBI was there,
20 Defendant volunteered that ICE agents had searched his computers and interviewed him
21 regarding child pornography a few weeks earlier. Agent Gumtow testified that Defendant
22 already had an explanation as to why child pornography files could have been on a computer
23 at the house.

24 When asked about child pornography, Defendant was vague and evasive at first. He
25 said that if it had occurred, it had been in the past and the pictures had been destroyed long
26 ago. He said that he was being very careful with the words he was choosing.

27 Agent Gumtow testified that Defendant said he thought the child pornography images
28 might be on Defendant's computer because his credit card had been used to buy child

pornography on another website. When Agent Campbell told Defendant that agents had used a file-sharing application called LimeWire to download files from a computer at his residence, Defendant admitted to using a file-sharing application to download child pornography. Agent Campbell then asked Defendant if Defendant would look at the images the FBI had downloaded to see if Defendant recognized any of them. Defendant was shown images of the downloaded files and a list of the files names. According to Agent Campbell, at this point, Defendant became more truthful and less evasive. He admitted that he had downloaded child pornography previously and provided details. He agreed to look at the images and mark the ones he recognized. Agent Campbell did not recall Defendant being or becoming reluctant. Defendant testified that he marked three of the images and then stopped. He was uncomfortable and thought it was a bad idea to continue.

The interview, which was not recorded, lasted approximately an hour. According to Agent Campbell, Defendant seemed at ease during the interview and was cooperative throughout. He never seemed angry, upset, nervous or uncomfortable. Agent Gumtow testified that Defendant never seemed reluctant and, in fact, seemed eager to talk. He was never accused of a crime. He implicated himself more than either agent did.

At the conclusion of the interview, the agents indicated they would like to talk to Mrs. McKerlie, who was waiting in a back bedroom. She came out to the living room and the Defendant went through the sliding door into the backyard. After interviewing Mrs. McKerlie, the agents told the McKerlies what would happen next, then the agents left the residence.

Defendant testified that he felt compelled to talk to the agents because his employment required him to cooperate with law enforcement officers. He admitted that he never mentioned the employment policy to the FBI agents during the interview. On cross-examination, Defendant also admitted that he did not bring a copy of the employment policy with him to court and could not relate the policy exactly. He admitted that the cooperation with law enforcement that is required is in the course of his employment. When asked if there was anything in the employment policy that says that employees lose their rights and

must sit down and conduct an interview with law enforcement – completely outside of employment – Defendant admitted that the policy was not that specific. Moreover, he conceded that no one at work told him he had to speak with FBI agents.

The only significant factual dispute in the testimony was whether Defendant mentioned or requested an attorney during the interview. Defendant admitted that he was at first evasive until it became clear that being evasive wasn't going to get him anywhere. At that point he asked, "If I should have an attorney" or "do I need an attorney?" According to Defendant, Agent Campbell put his elbow on his knees and thought for a while, then said, "We're just conducting an interview." Then the interview continued.

In contrast, Agent Campbell testified that he didn't recall Defendant asking about an attorney. If he had asked if he needed an attorney, it would have been Agent Campbell's standard procedure to respond: "It's up to you. I can't advise you either way." If an individual stated he wanted to speak to an attorney, Agent Campbell would stop the interview. Agent Gumtow testified that Defendant never mentioned an attorney. If Defendant had, Agent Gumtow would have included it in his notes. In fact, according to Agent Gumtow, Defendant never indicated he was uncomfortable or did not want to continue with the interview. Agent Gumtow noted that Defendant did far more talking than either agent.

Defendant was indicted on July 21, 2010 for one count of Distribution of Child Pornography and one count of Possession of Child Pornography.

**Analysis**

Defendant moves to suppress his statements made to agents on August 7, 2009 on the ground that the interview constituted a custodial interrogation by agents in violation of Defendant's *Miranda* rights.

*Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal proceedings. Statements made while a defendant is in "custody or otherwise deprived of [his] freedom of action in any significant way" which are not preceded by *Miranda* warnings are inadmissible in evidence. *Id.* at 444. A defendant is considered to be "in custody" for purposes of

*Miranda* if a reasonable person would believe that he or she was not free to leave. *See United States v. Kim*, 292 F.3d 969, 973-74 (9th Cir. 2002) (citing *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.1987)). The following factors are among those likely to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the interrogation; and (5) the degree of pressure applied to detain the individual." *Id.* at 974 (citations omitted).[1]

Application of these five factors to the instant case supports a finding that Defendant was not in custody at the time of his interview. Agent Campbell "summoned" Defendant for an interview by explaining that a search warrant had been executed and inviting Defendant to meet at either the FBI office or Defendant's residence. Defendant elected to meet at his residence. *See California v. Beheler*, 463 U.S. 1121, 1125 (1982) (in determining whether suspects were "in custody" for *Miranda* purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law officers understanding that questioning would ensue). There is no evidence in the record to suggest that once Defendant arrived home, agents made any statements to him to suggest that he was not free to leave or that the interview was required. Instead, the agents specifically told Defendant that he was not under arrest and asked Defendant if he would be willing to talk.[2] *See United States v. Craighead*,

---

[1] The parties both argued this Motion in the context of these five factors, and thus the Court applies these factors in its analysis. However, *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) suggests that other factors may be more applicable in the context of an in-home interrogation, specifically: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." Accordingly, the Court examines Defendant's Motion in light of *Craighead* as well.

[2] The Magistrate does not credit Defendant's testimony that he was required to cooperate with law enforcement due to a work policy given: (1) Defendant's admission that the policy did not specifically apply outside of employment, (2) the fact that the Defendant did not mention the policy to the FBI agents, (3) the fact that no one at work had directed him to talk to the agents, and (4) that there was no evidence that he had told anyone at work, specifically his superiors, about the FBI's request to talk to him.

1  539 F.3d 1073, 1087 (9th Cir. 1988) (if a law enforcement officer informs the suspect that he
2  is not under arrest, that statements are voluntary, and that he is free to leave at any time, this
3  communication greatly reduces the chance that a suspect will reasonably believe he is in
4  custody).

5  Agent Gumtow testified that the agents did not accuse Defendant of a crime. Both
6  agents testified that they did not know which occupant of the residence may have
7  downloaded the images. Agents did not present the Defendant with evidence of guilt (the
8  downloaded images) until after Defendant had admitted to using a file-sharing application
9  to download child pornography. At that point, Agent Campbell asked Defendant if
10 Defendant would look at the images the FBI had downloaded to see if he recognized any of
11 them. Defendant agreed to do so and agreed to mark the images he recognized. Thus, the
12 second factor weighs in favor of a finding that Defendant was not in custody.

13 The physical surroundings of the interrogation also support a finding that Defendant
14 was not in custody. Defendant was interviewed in the living room of his home while the
15 agents sat on couches/chairs perpendicular to Defendant. The seating arrangement permitted
16 Defendant access to all other areas of the house. There were several doors leading from the
17 living room to other areas of the house, including the front yard and backyard. None of the
18 doors were blocked. Near the end of the interview, Defendant left the room to use the
19 restroom. After the interview, Defendant went out to the backyard. The nature of the
20 interview was relaxed; both agents remained seated and were dressed in plain clothes with
21 no firearms visible.

22 Defendant's interrogation was relatively short, lasting approximately one hour. Thus
23 this factor also weighs in favor of a finding that Defendant was not in custody. The Ninth
24 Circuit has upheld interrogations lasting "more than one hour," *United States v. Crawford*,
25 372 F.3d 1048, 1052 (9th Cir. 2004) and "approximately 45 minutes." *United States v. Norris*,
26 428 F.3d 907, 911 (9th Cir. 2005). This was not a "marathon session designed to force a
27 confession." *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985).
28

Finally, no pressure was applied to Defendant during the interview, and thus the fifth and final factor also weighs in favor of a finding that Defendant was not in custody. Defendant voluntarily returned Agent Campbell's phone call, voluntarily returned to his residence (rather than meeting for an interview at the FBI office), and voluntarily agreed to speak to the agents. The two agents did not make any threats or attempt to intimidate Defendant. They were dressed in plain clothes with no visible weapons and the interview atmosphere was friendly and polite.

Defendant contends that his case in analogous to *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 1988), in which the Ninth Circuit concluded that the defendant was interrogated while in custody and therefore should have been given his *Miranda* warnings. However, *Craighead* differs from this case in several key ways. First, the defendant's home in *Craighead* was "police-dominated" by the presence of eight law enforcement officers, representing three different law enforcement agencies, who were accompanied by two non-agents, one of whom was defendant's Air Force superior. *Id*. at 1085. Second, all of the law enforcement personnel were armed, some wore protective gear, and some of them unholstered their firearms in the defendant's presence. Third, the defendant was interviewed in a back storage room; the door to the storage room was closed and an armed officer wearing a raid vest leaned against it. *Id*. at 1086. Thus, the Court in *Craighead* concluded that the defendant reasonably believed there was nowhere else for him to go.

Defendant also argues that his case is akin to *United States v. Brobst*, 558 F.3d 982 (9th Cir. 2010); however, the Magistrate concludes that *Brobst* is also factually distinct from this case: unlike Defendant, the defendant in *Brobst* arrived home while agents were searching his home; an armed uniformed officer confronted the defendant and announced "you need to come with me" before escorting the defendant into the home and "immediately" confronting him with evidence of child pornography. Unlike Defendant, the defendant in

*Brobst* was not asked whether he would be willing to speak to agents, nor was he given a choice about being interviewed in his home.[3]

**RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendant's Motion to Suppress or Exclude Statement. (Doc. 16.)

The parties have fourteen (14) days to serve and file written objections to the Report and Recommendation. The parties are advised that any objections should be filed with the following caption: **CR 10-1783-TUC-FRZ.**

DATED this 3rd day of October, 2011.

Jennifer C. Guerin
United States Magistrate Judge

---

[3]The Motion to Suppress Statements did not argue for suppression due to Defendant's invocation of right to counsel. Nonetheless, this report briefly addresses the issue since it was raised at the evidentiary hearing. The Magistrate does not credit Defendant's testimony that during the interview he asked, "If I should have an attorney" or "do I need an attorney?" Both agents credibly testified that Defendant never asked about an attorney. Agent Campbell credibly testified that if Defendant had asked about an attorney, Agent Campbell would have provided his standard response, and Agent Gumtow credibly testified that if Defendant had inquired about his right to an attorney Agent Gumtow would have made a note of the request. Regardless, even if Defendant had made the statements alleged, the statements would not amount to an invocation of his *Miranda* rights. A suspect must actually invoke the right to counsel in order for officers to be barred from questioning the suspect. *Davis v. United States*, 512 U.S. 452, 458 (1994); *United States v. Washington*, 462 F.3d 1124, 1134 (9th Cir. 2006). If a suspect merely makes an equivocal or ambiguous reference to an attorney, this is insufficient to require the cessation of questioning. *Davis*, 512 U.S. at 459 ("reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel . . . do[es] not require the cessation of questioning") (emphasis in original); *Washington*, 462 F.3d at 1134.